JIM CAUSLEY PONTIAC, Division Jim Causley, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 77–1737.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 30, 1980.

Decided April 23, 1980.

Harry A. Carson, Thomas E. Reiss, McClintock, Donovan, Carson & Roach, Detroit, Mich., for petitioner.

Elliott Moore, John H. Ferguson, Deputy Associate Gen. Counsel, Peter Winkler, N. L. R. B., Washington, D. C., Bernard Gottfried, Director, Region 7, N. L. R. B., Detroit, Mich., for respondent.

Before WEICK, BROWN and KENNEDY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Petitioner Causley Pontiac appeals a decision and order of the National Labor Relations Board holding that Causley Pontiac committed an unfair labor practice in violation of Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158, by laying off its employee John Wittbrodt on December 7, 1976 because he had filed a complaint with the Michigan Department of Public

Health under Michigan's Occupational Safety and Health Act (MiOSHA).[1]

Section 8(a)(1) of the National Labor Relations Act provides that it is an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their rights under Section 7 of the Act.[2] One of the rights afforded employees under Section 7 of the National Labor Relations Act is the right to engage in concerted activities for mutual aid and protection.[3] The Board found that before sending the initial letter of complaint Wittbrodt had obtained permission from one of his co-workers to use his name and that Wittbrodt was therefore engaged in protected concerted activity in making the complaint. It also found that Wittbrodt was laid off because he made the complaint under MiOSHA.

The issue before this Court is whether the Board's decision is supported by substantial evidence on the record as a whole, including the body of evidence opposed to the Board's view. *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 487–491, 71 S.Ct. 456, 463–466, 95 L.Ed. 456 (1951). This standard of review does not allow the reviewing court to set aside the Board's choice between two conflicting views of the evidence if it is supported by substantial evidence, even though the court might have reached a different conclusion if the matter had been before it *de novo. Universal Camera Corp. v. N. L. R. B., supra; N. L. R. B. v. Cavalier Olds, Inc.*, 421 F.2d 1234 (6th Cir. 1970).

With that standard in mind we review the facts in this case.

The record in this case discloses that Wittbrodt began working for Causley Pontiac on May 5, 1976 as a painter of automobiles, doing the majority of Causley's warranty painting. Wittbrodt testified that he complained to Bob Strickroot, the supervisor assigned to the sales-service building, about excessive paint fumes in his work area and about the dangerous proximity of the paint fumes to the pilot lights of gas heaters nearby. Bertram Strickroot, Wittbrodt's immediate supervisor, testified that Wittbrodt complained to him about the volume of the telephone buzzer at his work location in or around October, 1976.

Leo Chiotti, the other employee in Wittbrodt's work area, testified that he complained to five management employees, including Mr. Causley, about excessive paint fumes in the area and suggested that an exhaust fan be installed. Wittbrodt's co-worker Chiotti testified that Wittbrodt showed him the original letter of complaint and asked permission to use Chiotti's name and that permission was granted. The letter regarding the conditions of Wittbrodt's workplace resulted in the filing of a formal complaint under MiOSHA on October 25, 1976.[4] Chiotti was transferred from that work area during the month of November, 1976, prior to the arrival of the MiOSHA inspector.

Two other painters were temporarily moved to Wittbrodt's work area in the month of November, after the filing of Wittbrodt's complaint, but prior to the arrival of the MiOSHA inspector. One of these employees testified that he complained to management about the excessive paint fumes and that the employees discussed the matter between themselves.

It is not disputed that on December 7, 1976, Gerard Noronha, a Health Engineer

---

1. M.C.L.A. § 408.1001, *et seq.*

2. 29 U.S.C. § 158.

3. 29 U.S.C. § 157:
   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

4. It should be noted that Wittbrodt's claim of wrongful discharge could also have been pursued under § 408.1065 of Michigan's Occupational Safety and Health Act, M.C.L.A. 408.-1001, *et seq.*

employed under MiOSHA, made an unannounced visit to Causley Pontiac as a result of the complaint by Wittbrodt. Noronha arrived at about 8:30 A.M. on that date. It is also not disputed that Wittbrodt was fired on that same morning. Gerard Noronha did not disclose the identity of the complainant to Causley Pontiac.

The Board's finding that Wittbrodt was engaging in protected activity under Section 7 of the Act in making the complaints to management and under MiOSHA was based on two rationales. First, the Board found that the "seed of ultimate group action had been planted" when Wittbrodt showed his October 12 complaint letter to co-worker Leo Chiotti and requested the authority to use Chiotti's name. Second, the Board ruled that concerted activity was present in this case under the doctrine announced in *Alleluia Cushion Co.*, 221 N.L.R.B. 999 (No. 162, 1975), in which the NLRB held that when an employee seeks to enforce occupational safety statutes, designed to benefit all employees, it will imply consent by the other employees and concerted action in the absence of any evidence that fellow employees disavow such representation.

Since review of the whole record clearly indicates that there was substantial evidence to support the finding that the actions of Chiotti and Wittbrodt amounted to protected concerted activity within the meaning of Section 7 of the Act, we need not rely on the *Alleluia Cushion* doctrine to support that finding. This Circuit has ruled that concert of action is present if, from all of the facts and circumstances in the case, a reasonable inference can be drawn that the employees in question considered that they had a grievance and decided, among themselves, that they would take it up with management. The fact that the employees do not formally choose a spokesman and do not go together to see management does not negate concert of action. *N.L.R.B. v. Guernsey-Muskingum Electronic Co-op., Inc.*, 285 F.2d 8, 12 (6th Cir. 1960); *see also, ARO, Inc. v. N.L.R.B.*, 596 F.2d 713 (6th Cir. 1979). Wittbrodt's letter of complaint was part of a concert of action between him and Chiotti. At the time he made the complaint under MiOSHA only two employees, he and Chiotti, were affected by the working conditions in question. Wittbrodt was aware of Chiotti's complaints of health problems resulting from the working conditions and of Chiotti's own complaints to management on the matter. Thus, when Wittbrodt obtained permission to use Chiotti's name, the two employees were essentially agreeing to take up a common grievance with the proper authorities. Such action is well within the definition of concerted activity set forth in *Guernsey-Muskingum*.

Petitioner argues that the record does not support Chiotti's testimony of the agreement that his name be used in conjunction with the complaint. It is true that neither the letter of complaint nor the MiOSHA complaint form submitted by the Wittbrodt were signed by Chiotti. However, both documents make several references to Chiotti. For example, Wittbrodt's original complaint letter makes the following references to Chiotti and to their joint efforts:

> Directly across the aisle from me is a used car mechanic. He and I together have been talking to the service manager of the body shop with no results. The used car mechanic talked to Mr. Causley several days ago about the situation . . . . . The reason that I am writing you this letter is because we have tried to get results from the service manager and Mr. Causley himself with no satisfaction. . . . When Mr. Causley hears about my writing this letter to you, he will fire me for doing so, but I would like to see things corrected for the used car mechanic and also for myself.

The MiOSHA complaint form similarly refers to Chiotti by title and work location as being affected by the conditions, as well as identifying him by his first name and his title as being under a doctor's care due to the conditions. The letter and the complaint form support, rather than refute, Chiotti's testimony regarding the agreement to use his name.

Petitioner's second argument is that the finding that Causley Pontiac had knowledge that Wittbrodt was engaged in the concerted activity is not supported by substantial evidence. This argument focuses first on Causley Pontiac's alleged lack of knowledge that Wittbrodt filed the complaint. After a careful review of the record, however, we must conclude that the Board's determination in this matter was supported by substantial evidence. The record indicates that on the morning of the inspection Mr. Causley was given a document which, although it did not disclose the identity of the complainant, did identify the two nonmanagement positions that were affected by the complaints. It would be reasonable to infer that Mr. Causley would conclude that one or both of those employees must have filed the complaint. Further, the complaint form that was given to Causley referred not only to the employees' discomfort in breathing the paint fumes, but also the proximity of gas heaters to the fumes and the loudness of a telephone buzzer in the area. The only references in the record to complaints to management on the second and third items are to complaints made by Wittbrodt. Finally, the sequence of events in this case also supports the conclusion that Causley knew of Wittbrodt's involvement in the filing of the MiOSHA complaint. This Circuit has ruled that the proximity in time between recent protected activity and measures taken against the employee engaged in the activity lend support to the inference of an unfair labor practice. *N.L.R.B. v. Tennessee Packers, Inc., Frosty Morn Division*, 390 F.2d 782 (6th Cir. 1968). The facts in this case support such an inference since the MiOSHA inspector arrived at about 8:30 A.M. and Bertram Stickroot, Wittbrodt's supervisor, testified that Wittbrodt was laid off at about 9:15 the same morning.

A more difficult issue is whether Causley Pontiac knew that the activity in question was concerted in nature and not an individual action on the part of a single employee.[5] The Board made no specific finding that Causley Pontiac was aware that the activity in question was concerted, as opposed to individual. This Circuit has recently ruled that such knowledge is essential to the finding of a Section 8(a)(1) unfair labor practice. *Air Surrey Corp. v. N.L. R.B.*, 601 F.2d 256 (6th Cir. 1979).

In *Air Surrey* the employer had issued several payroll checks which initially had not been honored by the drawee bank because of insufficient funds. Subsequently, four employees went to the bank to inquire whether sufficient funds existed to cover the current payroll. The employer discovered the involvement of only one of the employees in this action and discharged him immediately. This Court held that the employer could not have violated Section 8(a)(1) absent any knowledge of the protected character of the employee's actions.

> It has long been the law in our circuit that an employer cannot be held in violation of § 8(a)(1) of the Act when it discharges an employee for activity which may in fact be protected under the Act but the employer lacks knowledge of its protected character. *N.L.R.B. v. Westinghouse Electric Corp.*, 179 F.2d 507 (6th Cir. 1949). It is the employer's knowledge of an employee's protected activity and his subsequent discharge of the employee for engaging in such activity which violates the Act.

*Air Surrey Corp. v. N.L.R.B., supra*, at 257. *See also*, Annot., 22 A.L.R. Fed. 113, § 4 at 127, § 6 at 130.

Since the ALJ and the Board in the instant case did not address this issue, we must remand[6] this case for a finding as to

---

**5.** Curiously, petitioner argues both that it did not know that the activity was concerted, as opposed to individual, and that it did not know who initiated the complaint since both Chiotti and Wittbrodt had complained to management about the situation.

**6.** Regarding the necessity for remand, see *N.L. R.B. v. Pipefitters*, 429 U.S. 507, 522 n.9, 97 S.Ct. 891, 900 n.9, 51 L.Ed.2d 1 (1977).

whether Causley Pontiac knew that the activity involved was concerted in nature.[7]

Causley's third argument is that there is no substantial evidence to support the conclusion that Wittbrodt was discharged because he had engaged in protected, concerted activity. This argument is chiefly focused on the failure of the Board to accept Causley's proof that the decision to discharge Wittbrodt had been based on low productivity and poor quality of work. Causley argues that the Board effectively erected a presumption against the veracity of testimony offered by the employer and, therefore, improperly altered the burden of proof.

■ The general counsel has the burden of proving the improper motive of the employer in the discharge of the employee. However, if the discharge was motivated in part by the protected activity, then a violation of Section 8(a)(1) has occurred. *N.L.R.B. v. Elias Bros. Restaurants, Inc.*, 496 F.2d 1165, 1167 (6th Cir. 1974).

■ In the instant case there was substantial evidence to support the finding that Causley Pontiac discharged Wittbrodt because of the protected, concerted activity. We have already concluded that there was substantial evidence to support the determination that Causley Pontiac knew that Wittbrodt had filed the MiOSHA complaint. We further conclude that there was substantial evidence to support the determination that that activity was at least part of the reason for Wittbrodt's discharge. Gerard Noronha, the MiOSHA inspector, testified that Mr. Causley was "pretty upset"

when he was told that there was going to be an investigation based on an employee complaint. The immediacy of Wittbrodt's firing after Mr. Causley learned of the MiOSHA complaint supports the conclusion that Wittbrodt was fired because of that complaint. As previously noted, the proximity in time between recent protected activity and the measures taken against the employee lend support to the inference of an unfair labor practice. *N.L.R.B. v. Tennessee Packers, Inc., Frosty Morn Division*, 390 F.2d 782 (6th Cir. 1968). It would be difficult to imagine any action taken against an employee that would be more immediate or more apparently responsive than the discharge of Wittbrodt in this case.

Of course, the body of evidence opposed to the Board's view must also be considered. *Universal Camera Corp. v. N.L.R.B., supra.* This evidence consisted of testimony by Causley's management employees that the decision to discharge Wittbrodt had been made at a meeting just moments prior to the arrival of the MiOSHA inspector, and was based on Wittbrodt's low productivity and the poor quality of his work. The Board rejected this testimony largely because of the inconsistencies and self-contradictions in the testimony of Causley's witnesses. The record indicates ample basis for such rejection. We need not review every inconsistency; two of the more visible examples should suffice.

Dominic Torres, the secretary-treasurer at Causley Pontiac, testified that the decision to lay off Wittbrodt was made at a management meeting on the morning of December 7, 1976, just prior to the arrival

---

7. Such a remand would be unnecessary if we adopted the holding in *Alleluia Cushion Co.*, 221 N.L.R.B. 999 (No. 162, 1975). There the Board held that concert of action will be implied from an employee's complaint seeking to enforce occupational safety and health statutes which are designed to benefit all employees. Since we have ruled that there was sufficient evidence to support the conclusion that Causley Pontiac knew that Wittbrodt had made such a complaint, the requirement of employer knowledge would be fulfilled by *Alleluia Cushion's* implied concert of action doctrine.

We are precluded, however, from adopting the holding in *Alleluia Cushion Co., supra*, by this Court's recent decision in *ARO, Inc. v. N.L.R.B.*, 596 F.2d 713 (6th Cir. 1979), which rejected the theory of implied concert of action and held that an employee must be actually, rather than impliedly, representing the views of other employees in order to be engaging in protected concerted activity. When the holding in *ARO* is applied to the requirement that the employer have knowledge of the concerted nature of the activity, it is clear that in a case such as this one the employer must know that the complaining employee is actually representing the views of other employees.

of the MiOSHA inspector. In a sworn statement made on December 21, 1976, Torres stated that he did not recall any decision to lay off Wittbrodt at the December 7th meeting.

Bertram Strickroot, Wittbrodt's supervisor, also testified that the decision to lay off Wittbrodt was made at the December 7th meeting. He testified that Wittbrodt's production was less than half that of the other painters. Stickroot also testified, however, that Wittbrodt was laid off rather than dismissed and that there was an expectation that he would be called back. The Board found that it was "implausible to conceive [that Causley] seriously would desire to renew the services of an employee who it claims is such a low producer and . . . possesses the poor work habits and workmanship qualities as [Causley] seeks to ascribe to Wittbrodt." We agree. We conclude that there was substantial evidence to support the Board's conclusion that the discharge was based, at least in part, on Wittbrodt's protected activities rather than on poor productivity and poor work habits as claimed by Causley Pontiac.[8]

In accordance with the foregoing analysis we remand this case to the Board for it to make findings of fact as required by this opinion.

---

8. In so deciding we are not unmindful of the testimony that all of the painters were paid on a piece-work basis and that Wittbrodt's paychecks, when compared with those of the other painters, demonstrated that his productivity was less than half that of the others. Causley's argument relating to this testimony, however, is unconvincing because it fails to discuss evidence that the other painters had helpers who were paid out of their salaries and evidence that payment for warranty work, Wittbrodt's chief job, was not calculated under the same method as payment for other types of painting.